**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LANIER M. HYLTON,

                *Plaintiff*,

      v.

MARK A. CALABRIA,

                *Defendant*.

Civil Action No. 17-2023 (RDM)

<u>**MEMORANDUM OPINION**</u>

Plaintiff Lanier Hylton, proceeding *pro se*, alleges that the Federal Housing Finance Agency ("FHFA") discriminated against him based on his race, age, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, when it failed to hire him for the position of ombudsman.  Dkt. 26 at 3.  Defendant Mark A. Calabria, Director of the FHFA, moves for summary judgment, arguing that the FHFA failed to hire Hylton for a legitimate non-discriminatory reason: He lacked relevant experience.  Dkt. 24 at 17.

For the reasons explained below, the Court will **GRANT** Defendant's motion for summary judgment.

## I.  BACKGROUND

**A.**    **Factual History**

For purposes of the present motion, the Court construes the facts in the light most favorable to Hylton, the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378  (2007).  Because

the case comes before the Court on the FHFA's motion for summary judgment, the Court recites here only undisputed facts unless otherwise noted.  *See* Fed. R. Civ. P. 56(a), (c)(1).

The FHFA is an independent regulatory agency tasked with supervising Fannie Mae, Freddie Mac, and the Federal Home Loan Banks (together "Government-Sponsored Enterprises" or "GSEs") to promote a stable housing and mortgage market.  Dkt. 24-6 at 4 (Baum Decl. Ex. 1).  On August  6, 2010, the FHFA posted vacancy announcements for the position of ombudsman.  *Id.* at 4–11.  The position description defined the primary duties of that position (approximately 40% of the job duties) as "dispute mediation, conciliation, and resolution" concerning matters "relating to FHFA's regulation and supervision of the" GSEs.  *Id.* at 13 (Baum Decl. Ex 2).  Other duties included problem identification, liaison services, and policy review.  *Id.*  The vacancy announcements listed the minimal qualifications for the position as "one year of specialized experience at least equivalent to the GS-14 equivalent . . . level . . . relat[ing] to the line of work of the position to be filled and which has equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position."  Dkt. 24-6 at 5 (Baum Decl. Ex. 1).  In further explanation, the vacancy announcements offered the following examples:  "(1) implementing or administering the process for investigating and resolving complaints or appeals; (2) developing programs and policies to foster partnerships with affinity groups and professional organizations to preempt future issues or concerns; and/or (3) performing assessments and analyzing the seriousness and extent of complex situations in order to make recommendations for harmonious settlement of issues."  *Id.*

Hylton, who is African American and paraplegic, has worked for the U.S. Department of Housing and Urban Development ("HUD") since 1989.  Dkt. 6-1 at 13–16.  At the time in

question, he was 55 years-old and employed as a Housing Program Manager at the GS-15 level.

*Id.* at 13, 34.  In that role, he

> provid[ed] senior management support to the Director of [the Office of Program Management Systems for Multifamily Housing Programs] to manage a HUD staff of eighteen . . . and contract staff of 128 responsible for planning, implementing, and management of new systems development projects; maintenance of legacy systems; and serve[d] as the information liaison to internal and external clients, which includes Multifamily Housing's 62 field staff.

*Id.* at 13.  On August 20, 2010, Hylton applied for the posted FHFA ombudsman position.  Dkt. 24 at 3 (Def.'s SUMF ¶ 3).  He had never before worked for an ombudsman and had never worked for FHFA.  Dkt. 24-2 at 5–6 (Hylton Dep. 11:14–16, 12:12–21).  Aside from resolving employee disputes as a manager, he had no alternative conflict resolution experience.  *Id.* at 5–6 (Hylton Dep. 11:20–12:11).  He had no experience in "overseeing or examining Fannie Mae, Freddie Mac, or the federal home loan banks."  *Id.* at 6–7 (Hylton Dep. 12:20–13:2).

Hylton submitted his application through the Avue Digital Services ("AVUE") automated system, which the FHFA used to process applications at that time.  Dkt. 24-6 at 18 (Baum Decl. Ex 3); Dkt. 24-4 at 1 (Adelekan Decl. ¶ 5).  The AVUE system required applicants to answer certain questions and, based on those answered, the system "automatically generated a score."  Dkt. 24-4 at 1 (Adelekan Decl. ¶ 7).  "An applicant could increase his or her score by embellishing his or her experience in responding to the questions in the automated system."  *Id.* at 2.  In Hylton's case, the AVUE system "automatically assigned his application a score of 94."  *Id.* (Adelekan Decl. ¶ 8).  As part of Hylton's application, he checked a box accompanied by text that stated: "The Federal Government's hiring options include special appointing authorities for people with disabilities.  Federal employers are authorized to use these authorities when considering certain people with disabilities.  I wish to be considered under these authorities."

3

Dkt. 6-1 at 4.  Hylton contends that by checking this box he applied for the ombudsman position under the "Schedule A" hiring process for federal employees with disabilities.  Dkt. 26 at 4 (Pl.'s SUMF ¶ 2).

Human Resource Specialist Mojisola Adelekan screened the applications for the ombudsman position to ensure that applicants were "minimally qualified" before they were passed on to an evaluation panel.  Dkt. 24-4 at 2 (Adelekan Decl. ¶ 9); Dkt. 24-7 at 2 (Burns Decl. ¶ 7); Dkt. 24-5 at 2 (DeMarco Decl. ¶¶ 6–7 ).  Hylton satisfied the minimum qualifications included in the vacancy announcement because he served in a position at the GS-15 level.  Dkt. 24-4 at 2 (Adelekan Decl. ¶¶ 9–10).   Adelekan prepared three "Certificates of Eligibles"— "Noncompetitive," "Merit Promotion," and "Nonstatus"—and assigned each of the minimally qualified candidates to one of these "certificates." [1]  *Id.* at 2 (Adelekan Decl. ¶ 9).  The "Noncompetitive Certificate" included five candidates at or above the EL-15 grade level (or its equivalent GS level).  *Id.*  The "Merit Promotion Certificate" included eight candidates below the grade level of the vacancy announcement.  *Id.*  Finally, the "Nonstatus Certificate" included ten candidates who were U.S. citizens.  *Id.*  Because Hylton held a GS-15 level position, Adelekan listed him in the Noncompetitive Certificate.  *Id.* (Adelekan Decl. ¶ 10).

Information concerning eligible candidates was then provided to a first applicant review panel.  That information included only the AVUE-generated score for candidates placed in the "Merit Promotion Certificate" category who were below the 15-grade level.  *Id.* (Adelekan Decl.

---

[1]  The certificate to which each applicant was assigned had some bearing on the evaluation process.  Dkt. 24-7 at 2 (Burns Decl. ¶ 8).  For example, the second panel could select and interview any candidate from the Noncompetitive and Merit Promotion Certificates of Eligibles that met their criteria but could select and interview only veterans from the Nonstatus Certificate. *Id.*

¶ 11).  Because Hylton, as a GS-15, received a Noncompetitive Certificate placement, his AVUE score was not provided to the first panel.  Dkt. 24-7 at 2 (Burns Decl. ¶ 11).

Senior Associate Director Margaret Burns led the first review panel; Associate Director for Congressional Affairs Peter Brereton and Principal Economist Samantha Roberts assisted Burns.  *Id.* at 1 (Burns Decl. ¶¶ 5–6).  The first panel decided to interview five candidates; Hylton was not one of them.  *Id.* at 2 (Burns Decl. ¶¶ 10–11).  Each of the five candidates selected either had (1) direct ombudsman experience or other job experience dealing with alternative dispute resolution, or (2) knowledge of the housing finance industry, especially of the entities regulated by the FHFA.  *Id.* (Burns Decl. ¶ 10).  One of the selected individuals had a score of 94; another had a score of 88.  Dkt. 6-1 at 44.  Burns attests, however, that AVUE scores were not "a factor in the decision to identify candidates for an initial interview, since that process was focused on the information contained in each candidate's application."  Dkt. 24-7 at 2–3 (Burns Decl. ¶ 11).  After interviewing those five candidates, the first review panel recommended three of them for second-round interviews conducted by a second review panel. *Id.* at 3 (Burns Decl. ¶ 12).  Of the three candidates recommended for second-round interviews, "two had significant prior experience in the conflict resolution area," and the other was "an FHFA examiner."  *Id.*  Additionally, two of the three candidates that advanced were African American.  *Id.*

The second review panel consisted of Edward DeMarco, who was the Acting Director of the FHFA and the selecting official for the ombudsman vacancy, as well as two other agency executives, Sandy Comenetz and Steve Cross.  Dkt. 24-5 at 1–2 (DeMarco Decl. ¶¶ 4, 8).  In December 2010, this panel interviewed the three candidates recommended by the first panel.  *Id.* at 2 (DeMarco Decl. ¶ 8 ).  After two rounds of interviews, DeMarco concluded that none of the

three candidates recommended by the first panel had the necessary "conflict resolution (i.e. ombudsman) skills, housing finance knowledge, and examination experience" to carry out the ombudsman role.  *Id.* at 2 (DeMarco Decl. ¶¶ 9–10).

On February 2, 2011, DeMarco reassigned Michael Powers, an FHFA executive who was not among the three candidates interviewed by the second panel, to the ombudsman position.  *Id.* at 2–3 (DeMarco Decl. ¶ 12).  DeMarco believed that Powers had the conflict-resolution skills and housing finance knowledge necessary for the ombudsman position.  *Id.* at 3 (DeMarco Decl. ¶ 13).  Among other things, Powers "was a veteran financial institution regulator and banker," who had "supervised and led multiple examination teams in the supervision of the Federal Home Loan Bank System . . . and its Office of Finance . . . and was part of [FHFA's Division of Bank Regulation]" and who had "routinely addressed concerns raised by the FHLBanks' presidents and Boards of Directors who were not happy with FHFA examiners' findings."  *Id.*  Powers was born in 1948 and, thus, is older than Hylton.  Dkt. 24-6 at 2 (Baum Decl. ¶ 9); *id.* at 18 (Baum Decl. Ex. 3).

## B.    Procedural History

On September 21, 2011, Hylton filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was discriminated against on the basis of his race (African American) and age (55) and physical disability (paraplegia).  Dkt. 26-1 at 38 (Ex. 2).  After the EEOC accepted his complaint for investigation, an Administrative Law Judge ("ALJ") dismissed the complaint for failing to state a claim under 29 C.F.R. §1614.107(a)(1), *id.* at 39, and Hylton appealed the ALJ's decision to the EEOC's Office of Federal Operations ("OFO").  Dkt. 1 at 8–9.  On June 29, 2017, the OFO affirmed the ALJ's determination that Hylton failed to establish that he had been "discriminated against by [the

6

FHFA] as alleged," and it notified Hylton of his right to file a civil action within 90 days of receipt of the OFO decision. *Id.* at 9–10.

Hylton commenced this suit on October 2, 2017, alleging that the FHFA discriminated against him based on his race, age, and disability in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, the ADEA, 29 U.S.C. § 621 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, respectively, when FHFA failed to hire him for the position of ombudsman. Dkt. 1. The FHFA moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. 4 at 1. On September 13, 2018, this Court granted the FHFA's motion to dismiss Hylton's disparate impact claim but denied its motion to dismiss Hylton's disparate treatment claims. Dkt. 12 at 10. Now that the parties have completed discovery, the FHFA moves for summary judgment on all the remaining claims. Dkt. 24 at 1.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A fact is "material" if it is capable of impacting the outcome of a suit. *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson,* 477 U.S. at 248). Relevant here, a "document filed *pro se* is 'to be liberally construed.'" *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 392 (D.C. Cir. 2020) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, "*pro se* litigants do not have a 'license' to 'ignore

the Federal Rules of Civil Procedure.'" *Id.* at 397 (quoting *Moore v. Agency for Int'l Dev.*, 994

F.2d 874, 876 (D.C. Cir. 1993)).

## III. ANALYSIS

### A. *McDonnell Douglas* Framework

Under the Rehabilitation Act, "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, . . . be subjected to

discrimination under any program . . . conducted by any Executive agency." 29 U.S.C. § 794(a).

The ADEA prohibits an employer from "fail[ing] or refus[ing] to hire . . . any

individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Finally, Title VII

protects "applicants for employment" against "discrimination based on race." 42 U.S.C.

§ 2000e-16(a). To make out a claim of disparate treatment under the Rehabilitation Act, ADEA,

or Title VII, a plaintiff must show that he suffered an adverse employment action because of his

disability, age, or race, respectively. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir.

2008).

Absent direct evidence of discrimination, courts assessing disparate treatment claims

under these statutes employ the burden-shifting framework from *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973).[2] Under this framework, a plaintiff must first establish a prima facie

case of discrimination by showing that "(1) [h]e is a member of [a] protected class; (2) [h]e

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004)

---

[2] Courts use this same *McDonnell Douglas* burden-shifting approach from the Title VII context
when evaluating age discrimination claims under the ADEA and the disability discrimination
claims under the Rehabilitation Act. *See, e.g.*, *Paquin v. Federal Nat'l Mortg. Ass'n*, 119 F.3d
23, 26 (D.C. Cir. 1997) (ADEA); *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)
(Rehabilitation Act).

(quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).   Once the plaintiff establishes his prima facie case, the burden of production shifts to the defendant to provide evidence of a legitimate, non-discriminatory reason for the hiring decision.   *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009).   In *Figueroa v. Pompeo*, the D.C. Circuit established four factors that an employer must satisfy in order to meet his burden of production: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding);" (2) "believ[ing]" this evidence, the factfinder "must reasonably be able to find that the employer's action was motivated by a non-discriminatory reason;" (3) this non-discriminatory explanation must be "legitimate" and "facially credible" in light of the proffered evidence; and (4) the evidence must provide a "clear and reasonably specific explanation" so that the plaintiff has "a full and fair opportunity to attack the explanation as pretextual."   923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (internal quotation marks and citations omitted).   After the defendant has met this burden of production, the sole question for the district court on summary judgment becomes: "Has the [plaintiff] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the [plaintiff] . . . ?"   *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

**B.     Legitimate, Non-Discriminatory Reason**

The FHFA has carried its burden under the *McDonnell Douglas* framework and *Figueroa* by offering a legitimate, non-discriminatory reason, supported by evidence, for its failure to hire Hylton: He did not have (1) prior dispute resolution or negotiation experience as an ombudsman or in some other form or (2) knowledge of the GSEs with which FHFA worked.   The FHFA cites the declaration of Senior Associate Director Burns, who led the first panel, attesting that the first

panel sought a candidate who: "(1) had previous professional experience working with or for an [o]mbudsman or who w[as] engaged in work relating to or directly performing dispute resolution or negotiation activities (i.e., ombudsman skills) and/or (2) who had knowledge of the housing finance industry, particularly of the entities regulated by FHFA."   Dkt. 24-7 at 2 (Burns Decl. ¶ 10).  Similarly, Associate Director for Congressional Affairs Brereton, who assisted Burns on the first review panel, testified at deposition that the panel was looking for candidates who "had something related to ombudsman work…[a]nd…familiarity with or involvement with safety and soundness regulation."  Dkt. 24-3 at 3-4 (Brereton Dep. 5:16–6:2).  These criteria, moreover, align with the vacancy announcement itself, which described the ombudsman's primary duties as "dispute mediation, conciliation, and resolution."  *See* Dkt. 24-6  at 13 (Baum Decl. Ex 2).  The five applicants selected for first-round interviews each satisfied at least one of the two criteria identified by these members of the first panel.  Dkt. 24-7 at 2 (Burns Decl. ¶ 10).  According to Burns, the panel did not select Hylton for an interview and further consideration for the position because "he did not meet any of the criteria utilized by the initial interview panel."  *Id.*  (Burns Decl. ¶ 11).  Hylton himself admits that he never worked as an ombudsman and has limited knowledge of FHFA regulations.  Dkt. 24-2 at 5–7 (Hylton Dep. 11:14–13:2).

The FHFA has offered a legitimate reason for failing to hire Hylton, supported by evidence that would allow a reasonable jury to find that FHFA's decision was based on a non-discriminatory rationale:  Hylton did not meet any of the criteria utilized by the first panel.   The FHFA has therefore carried its burden under *McDonnell Douglas* and *Figueroa*.  *See Figueroa*, 923 F.3d at 1087–88.

## C.      Pretext

Because the FHFA has proffered (and supported) a legitimate, non-discriminatory reason

for not selecting Hylton, the burden shifts to Hylton to identify evidence that would allow a

reasonable jury to find that his lack of ombudsman skills and regulatory knowledge were "not

the actual reason" for his non-selection and that, instead, the FHFA did not select him because of

his disability, race, or age.[3]  *See Brady*, 520 F.3d at 494; *see also Franklin v. Potter*, 600

F.Supp.2d 38, 73–75 (D.D.C. 2009) (applying *Brady* under the Rehabilitation Act).

Hylton does not dispute that each of the five applicants selected for an interview, as well

as the individual eventually hired, satisfied at least one of the two selection criteria identified by

Burns and Brereton, nor does he dispute that he failed to meet either criteria.  *See* Dkt. 26.

Instead, he argues that the criteria the panel utilized were "subjective" and at odds with those set

forth in the vacancy announcement, thus permitting a reasonable jury to infer the panel's

explanation was pretextual.  *See* Dkt. 26 at 10.  He also argues that the FHFA's failure to engage

in Schedule A hiring and what he characterizes as the FHFA's changing reasons for his non-

selection provide further evidence of pretext.  *See id.* at 7–8, 11–13.  None of Plaintiff's

arguments, however, are supported by evidence upon which a reasonable jury could find that the

---

[3]  Hylton's complaint alleges that the FHFA discriminated against him based on his race, age, and disability.  Dkt. 1 at 1, 3–4.  Although Hylton does not explicitly abandon his race and age discrimination claims, the strongest evidence he proffers in opposing the FHFA's motion for summary judgment is in support of his disability claim.  Dkt. 26.  Because this is the only claim that Hylton supports with *any* record material evidence in opposing the FHFA's motion for summary judgment, the Court's analysis will focus on the disability claim.  *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring "[a] party asserting that a fact . . . is genuinely disputed" to "support the assertion by . . . citing to particular parts of materials in the record").  Because the disability discrimination claim fails and his other claims for race- and age-based discrimination would be supported only by portions of the evidence and argument offered in support of the disability claim, those claims also fail.

FHFA's proffered reasons for failing to hire him were pretext for discrimination. *Brady*, 520 F.3d at 494.

       1.    *Evaluation Criteria*

Hylton first challenges the FHFA's use of the two criteria—(1) experience as an ombudsman or with conflict resolution and (2) familiarity with the regulated entities—because, he argues, they were implemented "post-hoc," lack "documentation," and were not explicitly mentioned in the written vacancy announcement. *See* Dkt. 26 at 8, 10.   Hylton further contends that he "clearly met all the job requirements stipulated in the vacancy announcement." *Id.* at 10. Finally, he argues that the FHFA's decision to interview a candidate with an AVUE-generated score of 88, while failing to interview him even though he had AVUE-generated score of 94, provides evidence of unlawful discrimination. *See id.* at 8.  The FHFA responds (1) that evidence shows that the criteria were not added "*post hoc*" because the agency used the criteria to evaluate candidates *during* the hiring process; (2) that an employer may lawfully "emphasize certain qualifications over others;" and (3) that the vacancy announcement and the hiring criteria are not dissonant. Dkt. 28 at 4–5.

A reasonable jury may infer discrimination where a plaintiff shows that he is "markedly more qualified" than the chosen candidate. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298–99 (D.C. Cir. 1998) (en banc); *Holcomb*, 433 F.3d at 897.  This follows because "employers do not usually [select a clearly less-qualified candidate for a position], unless some other strong consideration, such as discrimination, enters into the picture." *Aka*, 156 F.3d at 1294.  In *Aka*, the plaintiff showed that he was "markedly more qualified" for a pharmacy technician role at a hospital by presenting evidence that he had nineteen years of hospital experience and a master's degree in health service management, while the selected candidate had worked in the hospital

laundry for approximately a year and had no college education, but had volunteered in a pharmacy part-time for two months.  *Id.* at 1295–96, 1299.  The D.C. Circuit concluded that the qualifications gap was significant enough for a reasonable factfinder to infer discrimination from the employer's hiring decision.  *Id.* at 1299–1300.

Employers, moreover, are generally entitled to post broad job announcements and then to choose which specific qualifications they will treat as most important in selecting a candidate, without thereby inviting judicial second-guessing.  As the D.C. Circuit has explained, "job descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors—such as their strategic priorities and goals at the time" or "the strengths and weaknesses of the applicant pool . . . among many other factors."  *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007); *see also Elliott v. Acosta*, 291 F. Supp. 3d 50, 63 (D.D.C. 2018) (explaining that the employer did not commit a "misstep" if it "strayed from the specific criteria written in black and white").  When an employer chooses specific factors to emphasize, "courts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily," so long as they are not discriminatory or otherwise unlawful.  *See Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006); *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (rejecting plaintiff's assertion that "litigation experience is the most critical trait" for the position he sought and, instead, "defer[ring]" to the employer's nondiscriminatory decision "that while litigation experience is required, management experience is the most critical" trait for the role).  In *Barnette*, for example, the plaintiff had more supervisory experience and a higher employment grade level at the time of selection, but the candidate selected for the position had more leadership and relevant operational experience.  453 F.3d at

517.  The D.C. Circuit concluded that the employer's determination that operational experience

was more important was not, without more, evidence of pretext.  *Id.* at 517–18.

Applying this precedent, the Court concludes that Hylton has not shown that a reasonable

jury could find that the FHFA's proffered reason for declining to hire him was pretext for

discrimination.  First, no reasonable jury could find that Hylton was "markedly more qualified"

than the candidates selected for interviews, who themselves were eventually deemed

insufficiently qualified for the job.  *See Aka*, 156 F.3d at 1299.  The only evidence upon which

Hylton relies to advance this argument is his AVUE-generated score of 94, compared to the

score of one of the candidates chosen for an interview, which was 88.  *See* Dkt. 6-1 at 44.  But he

provides no evidence upon which a jury could conclude that the six-point margin between their

AVUE-generated scores shows that Hylton was "markedly more qualified" than this other

candidate who had more germane experience and who, in any event, was also not selected for the

job.  *See Aka*, 156 F.3d at 1299.  Moreover, it is undisputed that Adelekan did not provide

Hylton's score to the first hiring panel because Hylton was then-serving in a GS-15 level

position.  Dkt. 24-4 at 2 (Adelekan Decl. ¶¶ 10–11); Dkt. 24-7 at 2 (Burns Decl. ¶ 11).  Because

the first panel did not know Hylton's score, no reasonable jury could find that its decision to

interview someone with a lower score provides evidence of pretext.

Second, no reasonable jury could infer pretext for discrimination from the FHFA's

decision to prioritize ombudsman skills and financial regulatory knowledge in its ombudsman

hiring process.  *See* Dkt. 24-7 at 2 (Burns Decl. ¶ 10); Dkt. 24-3 at 3–4 (Brereton Dep. 5:16–6:2).

First, the fact that FHFA awarded Hylton and other applicants AVUE-generated scores does not

mean that it must accord those scores decisive (or even significant) weight in the hiring process.

Like the employer in *Barnette* that valued operational experience over supervisory experience,

14

the FHFA was permitted to value ombudsman skills and experience and knowledge regarding the regulation of GSEs over an AVUE-generated score—when hiring an ombudsman.  *See Barnette*, 453 F.3d at 517.  Hylton does not dispute that all five candidates selected for interviews had either ombudsman skills or relevant regulatory knowledge, while he had neither. Dkt. 24-7 at 2–3 (Burns Decl. ¶¶ 10–12).  He has offered no evidence to question the FHFA's showing that it is a permissible and nondiscriminatory "judgment call" to prioritize certain legitimate criteria when evaluating candidates accordingly.  *See Aka*, 156 F.3d at 1294.

Third, no reasonable jury could find that the first panel's criteria diverged from the vacancy announcement or were adopted post-hoc, and the panel's narrowed focus is permissible under this Circuit's precedent.  *Jackson*, 496 F.3d 708–09.  Although the vacancy announcement did not expressly state that "ombudsman experience" was required, it sought "knowledge of  . . . conflict resolution," Dkt. 24-6 at 5 (Baum Decl. Ex. 1), a key ombudsman skill that the hiring panel later emphasized, Dkt. 24-7 at 2 (Burns Decl. ¶ 10).  In addition, the announcement listed "[e]xpert [k]nowledge of . . . housing, mortgage, and financial markets."  Dkt. 24-6 at 5 (Baum Decl. Ex. 1).  This description corresponds with the "knowledge of the housing finance industry, particularly of the entities regulated by FHFA," that the first panel considered later in the hiring process.  Dkt. 24-7 at 2 (Burns Decl. ¶ 10); *see also Elliott*, 291 F. Supp. 3d at 63 (concluding that the "criteria on which the hiring officials relied were neither unknown nor developed post-hoc" where the job "announcement plainly outlined" the general criteria that the employer sought).  And, although the vacancy announcement listed other general skills such as "ability to communicate" that Hylton felt he possessed, in the absence of competing evidence or other reasons to question the employer's good faith, the Court must defer to what qualities the employer "weighs more heavily."  *See Barnette,* 453 F.3d at 517.

Hylton points to a December 5, 2010 email from FHFA Executive Sandy Comenetz to FHFA Director DeMarco, the selecting official for the ombudsman vacancy, that explains the role of the ombudsman (1) as "hear[ing] and investigat[ing] complaints and appeals from regulated entities and those that do business with the entities," and (2) "not [as] be[ing] an advocate [or making] decisions" or "hear[ing], investigat[ing], or try[ing] to resolve complaints and problems <u>within</u> FHFA."  Dkt. 26-1 at 195 (Ex. 6) (emphasis is original).  Based on this email, Hylton argues that the position is "clearly . . . a liaison" and that "in-depth knowledge of the oversight of GSEs" is not required.  Dkt. 26 at 10–11.  But no reasonable jury could find, based on the excerpted email alone, that "in-depth knowledge of GSEs" was *not* an important qualification.  To the contrary, the first sentence of the Draft FHFA Ombudsman Regulation in the email describes the ombudsman's duties as "hear[ing] and investigat[ing] complaints and appeals from regulated [GSEs] and those [who] do business with" them.  Dkt. 26-1 at 195 (Ex. 6).  Thus, if anything, the email supports the FHFA's assertion that relevant regulatory knowledge is a very useful skill for an ombudsman.

In sum, Hylton has not pointed to evidence upon which a reasonable jury could find that the FHFA's hiring criteria were pretext for unlawful discrimination.

2.    *Failure to Use Schedule A Hiring*

Hylton also argues that the FHFA's failures to treat his submission as a "non-competitive application," to refer his application to "the Disability Manager," or to "take seriously its stated commitment to disabled applicants," provides evidence that the agency's proffered rationale for his non-selection is pretext for disability-based discrimination.  Dkt. 26 at 7–8.  The FHFA responds that adherence to Schedule A hiring is not mandatory and that EEOC guidelines do not guarantee disabled applicants a job.  Dkt. 28 at 2–3.

16

5 C.F.R. § 213.3102 provides for "Schedule A" hiring, through which "[a]n agency *may* [non-competitively] appoint, on a permanent . . . basis, a person with an intellectual disability, a severe physical disability, or a psychiatric disability."  *Id.* § 213.3102(u)(1), (6) (emphasis added).  The regulatory language is permissive; it does not require agencies to hire a disabled applicant through non-competitive processes.  *See MacDonald v. Cohen*, 233 F.3d 648, 653 (1st Cir. 2000) ("Schedule A provides the agency a means to avoid competitive placement [to hire a disabled person] but does not impose an obligation to use this authority in any specific case."); *see also Ward-Johnson v. Glin*, No. 19-CV-00534, 2020 WL 2770018, at *8–*9 (D.D.C. May 28, 2020) (concluding that the plaintiff had not stated a claim for disability-based discrimination where her complaint alleged that the employer failed to invoke Schedule A to hire her but did not include "other allegations of disability discrimination, such as derogatory comments by management about disabled people").

As a result, no reasonable jury could find, based on the FHFA's failure to favor a disabled applicant when it was not legally required to do so and had not otherwise taken on such an obligation, that the FHFA's proffered explanation for its failure to hire Hylton was pretext for discrimination.  Hylton has not pointed to, nor is the Court aware of, any authority requiring an employer to refer a disabled applicant to a Disability Manager if the employer does not elect to engage in non-competitive hiring pursuant to Schedule A.  *See* Dkt. 26 at 7.  Hylton does point to an EEOC publication titled "The ABCs of Schedule A For the Human Resources Professional," which provides "Easy How To Steps" for human resources ("HR") professionals at agencies that are "[u]sing the Schedule A appointing authority."  Dkt. 6-1 at 20, 22, 31 (Ex. 2).  In particular, he relies on a section of that document that explains that "[o]ccasionally HR will initially be approached by an applicant directly," such as through a "vacancy announcement," and suggests

17

that, "[w]here this occurs, HR personnel should put the applicant in touch with the [Disability

Program Manager] and/or [Selective Placement Coordinator]," Dkt. 6-1 at 23 (Ex. 2); Dkt. 26-1

at 12–27 (Adelekan Dep.).   Hylton argues that the FHFA's failure to put him in touch with a

Disability Manager after he indicated on his application that he was interested in Schedule A

hiring is evidence of pretext.  *See* Dkt. 26 at 7–8.   But the "Easy How To Steps" publication does

not bind agencies or create any legal rights; rather, it provides advice regarding how an agency

should implement a discretionary authority to engage in non-competitive hiring.  *See generally*

Dkt. 6–1 at 20–31 (Ex. 2).   Plaintiff has offered no evidence even suggesting that the FHFA

voluntarily adopted internal protocols requiring the agency to engage in non-competitive hiring

pursuant to Schedule A or requiring referral to a Disability Manager.  *But cf. Gonzales v. Police*

*Dep't, San Jose,* 901 F.2d 758, 761 (9th Cir. 1990) (holding that failure to comply with an

internal affirmative action plan may support a discrimination claim).

   3.   *Changing Explanation of Hiring Process*

   Hylton further argues that the FHFA has changed its explanation regarding the hiring

process and that this flip-flop constitutes evidence of pretext.  Dkt. 26 at 11.  He alleges that

Burns denied scoring applicants during her deposition[4] and argues that this testimony is

---

[4]  In support of this contention, Plaintiff does not cite to Burns's deposition but, rather, cites to
her affidavit from the EEOC proceeding.  See Dkt. 26-1 at 198.  In his brief, Plaintiff excerpts
the following passage from the Burns deposition:

   A.   Yes, I led the panel, the initial panel that reviewed the applications that
        were provided by HR[] to us.  And the other panel members were Peter
        Bert and Samantha Roberts, and [I] then led that panel.  And we passed
        on our recommendations to the second panel, which consisted of Ed
        DeMarco, Steve Cross and Sandy Comentz [sic].

   Q.   And is that where—so did your panel provide any scoring or—on the
        applications that came from HR[?]

inconsistent with her recent declaration, in which she identified the two criteria—ombudsman skills and financial regulatory knowledge—utilized by the first review panel in its selection process. *Id.*; Dkt. 24-7 at 2 (Burns Decl. ¶ 10).  But, to support an inference of pretext, an employer's changing reasons for an adverse employment action must contradict one another. *See Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) ("Providing more detailed information once litigation begins does not create a genuine issue of material fact.").  Burns's denial of having assigned numerical scores to applicants is not inconsistent with her assertion that the panel utilized two criteria in evaluating applicants.  *See* Dkt. 28 at 6.  It was HR specialist Adelekan, moreover, who was responsible for assigning the certificates to the applicants, not the first review panel.  Dkt. 24-4 at 2 (Adelekan Decl. ¶ 9).  Thus, no reasonable jury could conclude, based on this evidence, that the first panel's explanation of its hiring process has changed over time.

4.     *Other Arguments*

Hylton also argues that the FHFA created "discriminatory barriers in recruitment and hiring," Dkt. 26 at 6, and that the FHFA's Equal Employment Opportunity ("EEO") Office "did not investigate his complaint," Dkt. 26 at 9.  But Hylton does not identify any evidence in support of these assertions such that a reasonable jury could find that the FHFA's explanation for its failure to hire Hylton was pretext for unlawful discrimination.

\*     \*     \*

---

A.     No.  No scoring on applications, no.  Scoring in the numerical sense?

Q.     Yes.

A.     No.

Dkt. 26 at 11.

The Court, accordingly, concludes that Hylton has failed to raise any genuine issue of fact concerning the FHFA's reasons for declining to select him to the agency's ombudsman.  As a result, the FHFA is entitled to summary judgment on Plaintiff's remaining claims.

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Defendant's motion to for summary judgment, Dkt. 24.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  October 19, 2020